FILED

06/13/2017

Clerk of the
Appellate Courts



IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2017

## EMMANUEL BIBB HOUSTON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bedford County
No. 2012CR17467   Forest Durard, Judge**

_____

### No. M2016-00467-CCA-R3-PC
_____

The petitioner, Emmanuel Bibb Houston, appeals the denial of his petition for post-conviction relief from his 2013 Bedford County Circuit Court jury convictions of especially aggravated kidnapping, aggravated burglary, and facilitation of especially aggravated robbery, claiming that he was denied the effective assistance of counsel at trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

M. Wesley Hall, IV, Unionville, Tennessee, for the appellant, Emmanuel Bibb Houston.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Robert James Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Bedford County Circuit Court jury convicted the petitioner of especially aggravated kidnapping, aggravated burglary, and facilitation of especially aggravated robbery for kidnapping, beating, and robbing the victim, Gregory Marlin in May 2012. The evidence adduced at the petitioner's trial, as summarized by this court on direct appeal, established that the petitioner

> entered the victim's house with the intent to beat him, as shown by his statements prior to arriving at the victim's house and his carrying a baseball bat concealed in his pants into the victim's house. [The petitioner] struck the victim

with the baseball bat three times, breaking five ribs and causing a large laceration on the victim's head. While no issue regarding serious bodily injury has been presented on appeal, we note that based on [medical] testimony and the victim's testimony, this element was clearly met. The victim testified that while he was on the ground after being struck, he saw [Samantha] Houston, [the petitioner's] sister, carrying the television from his bedroom. Then, [the victim] was hogtied by [the petitioner], possibly with Ms. Houston's assistance. The victim and [Ericka] Myrick both testified about how [the petitioner] tied the victim. After [the victim] was tied, [the petitioner] and [Deonta] Twilley carried the victim to the bathroom, literally throwing him inside. The victim freed himself after approximately thirty minutes and sought help at that point. In the meantime, a bone fragment from his rib punctured his lung, causing the lung to collapse and air to begin filling his chest cavity—a life-threatening condition known as pneumothorax.

*State v. Emmanuel Bibb Houston*, No. M2013-01177-CCA-R3-CD, slip op. at 10 (Tenn. Crim. App., Nashville, June 4, 2014), *perm. app. denied* (Tenn. June 15, 2015). In addition to this evidence, the proof showed that the victim's television was later located in a vehicle occupied by the defendant and his co-defendants and that the defendant admitted his involvement in the crimes to the police. *See id.*, slip op. at 6. This court affirmed the petitioner's convictions and the accompanying 23-year total effective sentence.

On January 21, 2015, the petitioner filed a timely petition for post-conviction relief and delayed appeal. The post-conviction court found that appellate counsel failed to file a timely application for permission to appeal to our supreme court or a motion to withdraw as required by the rules and granted the petitioner a delayed appeal for the purpose of filing an application for permission to appeal to the supreme court. The supreme court denied the petitioner's application, and the petitioner subsequently filed an amended petition for post-conviction relief. The court held an evidentiary hearing on the amended petition on October 26, 2015.

At the evidentiary hearing, trial counsel testified that he was appointed to represent the petitioner in the general sessions court and that he visited the incarcerated petitioner approximately five times during the nine months prior to the petitioner's trial. Counsel did not have a thorough recollection of the petitioner's trial, but he did recall visiting the petitioner, obtaining discovery materials, and speaking with the attorneys

who represented the co-defendants. Counsel also recalled that he endeavored to highlight for the jury the inconsistencies in the testimony offered by the State's witnesses. Counsel said that he received a list of the names of potential jurors and that he performed research into their backgrounds. Counsel could not recall when he had provided the discovery materials to the petitioner but was confident that he had done so.

Counsel testified that the petitioner "wrote a lot of" complaints to the Board of Professional Responsibility ("the Board") about counsel while the case was pending. Counsel acknowledged that he was censured by the Board for failing to timely file an appellate brief in the direct appeal of this case and for failing to respond to the petitioner's requests for information in a timely manner.[1]

Counsel said that he did not have the closing arguments transcribed in this case. He said that he raised the issue of a *Brady* violation both in his motion for new trial and on direct appeal.[2] Counsel admitted telling the petitioner that he believed the case to be one of aggravated assault and that the "especially aggravated kidnapping charge was foundless." Counsel also admitted having a conversation with the petitioner about the fact that he had been appointed to represent the petitioner rather than retained, explaining:

> We had a conversation. . . . I think it was at the conclusion of maybe the first day of trial. It wasn't over at the time.
>
> I wished he had had money, because it was a multi-day trial. I wished we would have been able to hire an investigator because I would have liked to have more further investigate[d] Mr. Marlin, to cross[-]examine him on different things.
>
> But I don't think that there was anything for us to discover. And . . . I would never make a promise that it would have been a different result.

Counsel said that the petitioner did not have the funds to hire an investigator and that, on those occasions when he had asked the court for funds to hire an investigator, his requests had been denied. He conceded that he did not ask for funds in the petitioner's case.

---

[1] The censure included other findings not relevant to this case.

[2] This court's opinion on direct appeal does not indicate that trial counsel raised a *Brady* claim on direct appeal.

Counsel identified a letter that he sent to the petitioner prior to the filing of the motion for new trial acknowledging that the petitioner had complained to the Board about his representation and asking the petitioner to allow him to finish the case before pursuing relief from the Board. In the letter, counsel informed the petitioner that had the petitioner hired him "and had the money, we would have hired a private investigator" and that "[t]hat would have been the difference in my representation. Not the difference in this case, but the difference in my representation." Counsel testified that the petitioner not only sent numerous letters to him during the pendency of the case but that he copied "every letter" that he sent to counsel to the Board, which required counsel to then respond to both the petitioner's original letter and to the complaint filed with the Board. He said that this practice significantly interfered with his ability to respresent the petitioner.

Counsel acknowledged that he did not subpoena those witnesses that the petitioner wanted to testify at his sentencing hearing and that he only attempted to secure the testimony of a single witness, who agreed to testify but did not actually do so.

During cross-examination, counsel testified that in addition to meeting with the petitioner at the jail, he met with the petitioner during court appearances. He said that he reviewed the discovery materials with the petitioner, that he investigated each of the State's witnesses, and that he spoke with each of the attorneys representing the co-defendants. Counsel said that he attempted to negotiate a plea agreement but that the State was adamant that the petitioner serve 85 percent of his sentence while the petitioner was adamant that he serve no more than 35 percent. He said that he informed the petitioner of the potential punishment he faced if convicted of the charged offenses. Counsel conceded that he told the petitioner that he believed the petitioner to be guilty of aggravated assault rather than especially aggravated kidnapping, but he maintained that he did not "guarantee anything" to the petitioner with regard to the outcome in the case.

Counsel agreed that although he did not conduct a "formal interview" of the lead detective in the case, he did speak with the detective about the case. He also said that the services of an investigator would be useful in every case but that the Administrative Office of the Courts did not often approve requests for funds to hire investigators. He testified that, even without the assistance of an investigator, he was able to gather the information necessary to try the case. He said, "I think that if we had had an investigator to look into Mr. Marlin a little more, it could have been helpful. I don't know that for sure." Counsel called the petitioner's claim that counsel said he would have worked harder had he been retained "absurd" and said that he "give[s] everything for every case regardless."

With regard to the allegd *Brady* violation, counsel explained that he initially missed a reference in the discovery materials to an audio recording of the

petitioner's statement. He said that the State generally sent copies of audio recordings to him on compact disc along with the other discovery materials but that they did not do so in this case. When he became aware of the recording at trial, he raised a *Brady* claim. Counsel said that he did not believe that the outcome of the trial would have been different had he been aware of the recording prior to trial, noting his opinion that the recording was relevant and admissible.

Upon questioning by the court, counsel stated that during plea negotiations, the petitioner insisted that he would accept no offer in excess of 12 years at 35 percent and that the State refused to offer any agreement that included a sentence of less than 12 years at 85 percent. Counsel said that he had hoped that an investigator could uncover any statements the victim made about the incident outside of court. His own investigation did not uncover anything of that sort. He recalled that his secretary, who "knows everybody," including the petitioner "and all his friends," provided him with "a lot of insight" that was helpful but that "there wasn't anything . . . to help" impeach the victim.

Attorney Kristin Green testified that she represented co-defendant Ericka Myrick on charges related to her role in the crimes against the victim. She had no recollection of counsel's having asked to interview Ms. Myrick or speaking with her about the case. She said that she did not know whether counsel's interviewing her client would have made a difference in the petitioner's case because she did not know the circumstances of the petitioner's case. Ms. Green recalled hearing counsel, when speaking to her and other attorneys in the presence of the petitioner during a recess, "make a comment to the effect of, Everybody knows you work harder when you're being paid." She classified the comment as "shocking" and said that she "was concerned" for counsel because "he had said something like that in front of the client."

During cross-examination, Ms. Green said that, had counsel asked to interview Ms. Myrick, she would have advised her not to speak with him. She said that it "became . . . overly apparent at some point, that some co-defendants were going to be cooperating and some were not" and that those similarly situated co-defendants "spoke more with one another about our client's situations." Ms. Green said that counsel made the comment about working harder when being paid while "just talking" to her and another attorney while seated at a table with the petitioner. She said that she thought the petitioner would have been able to hear the comment.

Tiffani Grogan testified that she had a romantic relationship with the victim that ended just before the offenses occurred in this case. She recalled that "years later," she and the victim briefly rekindled their romance. During that time, the victim

"bragg[ed] about the whole situation," claiming that "[h]e said some stuff on purpose . . . to make them believe . . . the reason why they was coming over there."

Deonta Twilley testified that he was charged with especially aggravated robbery, especially aggravated burglary, and especially aggravated kidnapping for his role in the attack on the victim. He pleaded guilty to especially aggravated burglary and robbery in exchange for a sentence of eight years to be served at 30 percent. He had no recollection of his own counsel's having spoken to petitioner's counsel about the case. He did recall that he was aware, prior to accepting the plea offer, that the State believed the petitioner to be the primary actor in the offenses.

Samuel Houston, the petitioner's father, testified that counsel never interviewed him prior to trial and did not ask him to testify at the sentencing hearing. He said that he would have testified that the petitioner was a good student, a good athlete, and that he had never given his parents any trouble as a child. During cross-examination, Mr. Houston acknowledged that after becoming an adult, the petitioner racked up arrests in Tennessee, Michigan, Alabama, New York, and New Jersey.

The petitioner testified that counsel visited with him at the jail only twice and that he spoke with counsel for 10 to 15 minutes at court dates each month. The petitioner recalled that, during one of the jail visits, counsel told him that counsel was going to California and that attorney James Tucker would be covering for counsel in court. Counsel did not tell the petitioner that Mr. Tucker had previously represented the victim. The petitioner testified that he knew that Mr. Tucker had represented the victim and that he believed it to be "very strange" that counsel would ask Mr. Tucker to cover for him.

The petitioner admitted writing a number of letters to the Board as a means to "get a point across" to counsel. He said that counsel had stopped responding to his letters. One of his specific complaints was that counsel failed to raise the *Brady* issue during trial or on direct appeal. He said that he wanted counsel to add the claim to his application for permission to appeal. The petitioner said that it was his belief that the recording had been the piece of evidence that sealed his fate.

The petitioner testified that counsel did not arrive at trial with prepared questions for cross-examination and that counsel did not provide him with a list of potential jurors prior to trial. He said that counsel assured him that, at most, he was guilty of aggravated assault and that he should not worry about the outcome of the trial. The petitioner acknowledged that he assaulted the victim but insisted that he did not bind the victim.

The petitioner said that counsel, while looking at a picture of the petitioner's truck, said, "'If I knew you had money in a truck like this, . . . you could have paid me instead of being appointed, and I could have probably hired a private investigator for you and you would have had a better result in this case.'"

The petitioner testified that he asked counsel to present his parents, the mother of his child, and "a lady named Lisa Irvan . . . to testify that [the victim] is a true criminal and woman beater" as witnesses at the sentencing hearing. Counsel did attempt to secure the attendance of the mother of the petitioner's child, but bad weather prevented her from attending the hearing.

During cross-examination, the petitioner admitted telling counsel that he would accept a plea offer that included a sentence of 12 years at 30 percent. The petitioner admitted that he never appeared in court with James Tucker, explaining that Mr. Tucker simply told him that he would ask for a continuance on the petitioner's behalf. He said that Mr. Tucker never spoke to him about the case and took no other action than to ask for a continuance. The petitioner acknowledged that he participated in the jury selection process but said that he was "rushed into it" because he was not provided with "the form" prior to trial.

The post-conviction court denied relief in an exceedingly thorough written order. We summarize the court's findings of fact and conclusions of law:

> 1. The petitioner failed to establish that "his conviction was based on a violation of the privilege against self incrimination" by failing to present any evidence "concerning whether [the p]etitioner was Mirandized prior to his interview by Detective Crews."
>
> 2. The petitioner failed to establish "any irregularities in the selection and retention of the [grand jury] foreperson."
>
> 3. The petitioner failed to present any evidence that counsel failed to file any meritorious pretrial motion, that counsel failed to effectively use his peremptory challenges, that counsel failed to adequately prepare for trial, that counsel failed to ask for any appropriate jury instructions, that counsel failed to investigate the background of the potential witnesses, or that counsel failed to object to perjury by a State's witness.

4. The petitioner failed to present any evidence that he was prejudiced by counsel's failure to apply for funds to hire an investigator. Although counsel "seemingly" indicated to the petitioner that the results of the trial would have been different had he had the services of an investigator, the petitioner never showed "what difference this actually would have made." The petitioner made no "showing of a particular need that was beyond the capabilities of trial counsel."

5. The petitioner failed to establish that he was prejudiced by counsel's failure to obtain prior to trial and challenge at trial his statement to Detective Crews that the offenses "had to happen." "Considering the number of essentially eye witnesses at trial and the other remarks made by the [p]etitioner, not contested herein, the failure to object would be harmless."

6. The petitioner failed to establish that he was prejudiced by counsel's failure to subpoena certain witnesses. None of the testimony presented through the witnesses at the post-conviction hearing "appeared to be helpful to the [p]etitioner."

7. Any prejudice flowing from counsel's failure to timely file an application for permission to appeal to the supreme court was cured by the grant of a delayed Rule 11 appeal. The supreme court reviewed and denied the delayed application for permission to appeal.

8. No evidence presented supported the petitioner's claim that newly discovered evidence undermined his conviction. Ms. Grogan's testimony offered "nothing of real substance that would have made a difference."

In this timely appeal, the petitioner contends that the post-conviction court erred by denying relief, alleging that he was denied the effective assistance of counsel at trial. He claims that counsel performed deficiently by failing to engage in adequate preparation and investigation. Specifically, he asserts that counsel failed to investigate "potential witnesses that 'would have been the difference'" because he failed to seek the funds to hire an investigator and that counsel failed to "notice, review, and challenge" the petitioner's pretrial statement to Detective Crews. In the alternative to granting relief

-8-

based upon these specific instances of deficient performance, the petitioner asks this court to change the law and "find that the cumulative errors of trial counsel when taken together undermine" confidence in the verdict of the jury.  The State contends that the post-conviction court properly denied relief because the petitioner failed to establish any prejudice as the result of any error of trial counsel.

We view the petitioner's claim with a few well-settled principles in mind.  Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States."  T.C.A. § 40-30-103.  A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence.  *Id.* § 40-30-110(f).  On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them.  *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).  By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal.  *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984).  In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief.  *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).  Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted).  We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision

made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the post-conviction court did not err by denying relief. Despite counsel's perplexing failure to obtain the audio recording of the defendant's pretrial statement and his implying, even in jest, that the outcome of the case might have been different had he been retained to represent the petitioner instead of appointed, the record simply does not support a conclusion that the petitioner was prejudiced by any of counsel's failings. The petitioner argues that counsel performed deficiently by failing to review the audio recording of his statement to Detective Crews, but he fails to even suggest how the case might have turned out differently had counsel reviewed the recording. Nothing in the record suggests that the statement was obtained in violation of the petitioner's constitutional rights, that it was otherwise inadmissible, or, most importantly, that the recorded statement was actually admitted into evidence at trial. The petitioner contends that counsel's failure to secure funds to hire an investigator coupled with his statement that he would have worked harder on the case had he been retained indicate that counsel failed to adequately investigate the case. The petitioner presented no evidence, however, of any fact or other item of consequence that counsel failed to uncover that would have altered the outcome of the trial.

As to the petitioner's request that this court work "a change in the law," we observe that the petitioner's brief does not actually indicate any specific change that should be made. He argues that the cumulative effect of counsel's errors indicates that counsel "so abdicated his role" that the petitioner "was effectively unrepresented." The record contains absolutely no evidence to support such a conclusion. Counsel met with the petitioner several times prior to trial, reviewed the discovery materials, and thoroughly cross-examined the State's witnesses to emphasize discrepancies in their testimony at trial. As indicated, those actions of counsel that might have amounted to deficient performance did not prejudice the petitioner.

Accordingly, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE